## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

### Newport News Division

|  |  |
|---|---|
| VERONICA MEADE<br>1287 Big Bethel Place<br>Hampton, VA  23666,<br><br>        Plaintiff,<br><br>    v.<br><br>CITY OF HAMPTON, VIRGINIA<br>22 Lincoln Street<br>Hampton, VA  23669,<br><br>        Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

FILED

JUN 27 2017

CLERK, US DISTRICT COURT
NEWPORT NEWS, VA

Civil Action No. _4:17cv70_

DEMAND:  TRIAL BY JURY

### COMPLAINT
#### (Racial Discrimination, Retaliation, Disparate Treatment, and Hostile Work Environment)

#### INTRODUCTION

1.     Plaintiff, Veronica Meade, is a Deputy City Attorney for Defendant, the City of

Hampton.  Because of her race and protected equal employment opportunity activity, her employer

has subjected her to numerous unjustified adverse employment actions, subjected her to unlawful

retaliation, disparate treatment, and creating a hostile work environment, entitling Plaintiff to the

relief sought.

#### JURISDICTION

2.     This Court has subject matter jurisdiction over the claims raised herein pursuant to

Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-5.  Subject matter

1

jurisdiction also exists pursuant to 28 U.S.C. § 1331, as this action arises under the laws of the United States, thereby presenting a federal question.

EXHAUSTION OF ADMINISTRATIVE REMEDIES

3.      Plaintiff sufficiently exhausted all available administrative remedies on her claims as the U.S. Justice Department issued a right to sue letter.  Plaintiff accepted service of this letter on March 30, 2017 (*see* Exhibit A).

VENUE

4.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e(f)(3) as Plaintiff is employed by Defendant in Hampton, Virginia, where the acts of discrimination, retaliation, disparate treatment, and hostile work environment complained of herein took place and where Plaintiff's personnel records are maintained.

THE PARTIES

5.      Plaintiff, Veronica Meade, is an African American female who at all relevant times served as an attorney for the City of Hampton.

6.      Defendant, City of Hampton, Virginia, is a municipal corporation of the Commonwealth of Virginia, having more than 1,600 employees in each of the last 20 months.

STATEMENT OF FACTS

7.      Hampton City Council appointed City Attorney Vanessa T. Valldejuli, a White/Hispanic female ("CA"), in the Hampton City Attorney's Office ("CAO") around February 2014.  The CA previously worked for the City from approximately 2005 to approximately 2013 as a Senior Deputy City Attorney.

2

8.     Throughout the CA's tenure, Plaintiff has been and continues to be subjected to a systemic pattern of racially motivated disciplinary action, discriminatory promotional and hiring practices, retaliation, harassment, disparate treatment, and a hostile work environment causing Plaintiff to seek treatment.   The CA is a Defendant appointee; therefore, Plaintiff informed Defendant of the complained-of behaviors.   Defendant failed to protect Plaintiff from the CA's illegal acts.

**Evaluations**

9.     Prior to the CA's tenure, Plaintiff received very good and excellent evaluations. However, the integrity of the evaluative process deteriorated under the CA with respect to Plaintiff.

10.     During Plaintiff's first evaluation with the CA around mid-2014, Plaintiff questioned her promotional opportunities.  The CA informed Plaintiff there were not any.

11.     In the May 13, 2015 evaluation, the CA claimed Plaintiff relies "too much on the word of employees rather than researching the issue and forming her own opinion."  Plaintiff disagreed, responding that, when she is "not certain of an answer, she routinely tells staff she will research the issue and get back to them with an answer."

12.     On January 12, 2016, Plaintiff received her mid-year evaluation wherein, pursuant to an attached employee customer survey, Plaintiff is accused of being arrogant, thinking she is better than those without degrees, hesitant to prosecute cases she has the slightest doubt of winning, slow responses to basic legal questions, lack of enthusiasm, and in need of an improvement plan. The responder chose to remain anonymous because it is believed Plaintiff "would be vindictive and would want to be vindicated by any means necessary."

13.     Plaintiff responded to the January 12, 2016 evaluation on January 22, 2016, in a memorandum to her immediate supervisor, Senior Deputy City Attorney Patricia Melochick (a) objecting to the employee's comment that Plaintiff essentially should commit malpractice in filing suit with insufficient facts then attempt to build a case, (b) finding that the responder's refusal to identify himself because he "believe[s] Ms. Meade would be vindictive and would want to be vindicated by any means necessary" not only is unfounded but racially laced; (c) protesting her denial of due process because she was not given the opportunity to be heard before committing the unfounded, defamatory comments to writing in Plaintiff's evaluation; and (d) questioning why a commendation from a member of the Hampton Parking Authority, one of Plaintiff's clients, submitted to the CA on December 15, 2015 was not included in her evaluation.

14.     Upon information and belief, the employee survey comments in Plaintiff's January 12, 2016 evaluation were submitted by one of the CA's friends in the City's Community Development Department.

15.     Plaintiff's specifically identified objections to the January 12, 2016 evaluation were met with protestations of the validity of the process and value of the responses.  However, the excellent survey responses that the other African American female Deputy City Attorney received were disregarded, and she was subjected to disciplinary action.

16.     On August 2, 2016, Plaintiff received another evaluation, wherein Ms. Melochick claims she had to learn of Plaintiff's deficient work product from department heads, including the grant contract among the National Fish and Wildlife Foundation, Chesapeake Bay Foundation, and the City ("NFWF/CBF Contract") and a Community Development Block Grant ("CDBG") agreement, including a failure to communicate on administrative matters.

17.     Plaintiff acknowledged making a few mistakes with the CDBG agreement, but she is not the only attorney in the office who has encountered difficulties in reviewing grant agreements.   Nor is Plaintiff the only attorney in the office to make mistakes, but Plaintiff's mistakes are magnified and her White counterparts (including the CA's and Ms. Melochick's) are minimized.

18.     Plaintiff responded to the August 2, 2016 evaluation on August 5, 2016 addressing the untrue statement of Ms. Melochick allegedly learning about Plaintiff's deficient work product from the Budget Director regarding the NFWF/CBF Contract.

19.     On March 21, 2016, Plaintiff received an assignment to review the NFWF/CBF Contract, which ultimately required City Council approval.

20.     On or about April 19, 2016, Plaintiff informed the CA and Ms. Melochick that the arbitration, indemnification, and attorney's fees provisions in the NFWF/CBF Contract conflict with state law and City practices.   The CA informed Plaintiff, and Ms. Melochick agreed, that only NFWF and CBF were in privity of contract; and as long as the CBF contract did not contain any conflicting provisions, Plaintiff should proceed to finalize the agreement, which she did.

21.     On May 11, 2016, Ms. Melochick claimed that a department head informed her, as if hearing it for the first time, the NWFW/CBF Contract contained language contrary to law and practice.

22.     Subsequently, Ms. Melochick admitted she had not even read the NFWF/CBF Contract; and in an attempt to cover up her and the CA's own deficient advice, asked Plaintiff to consider reasons for not sending the contract to City Council for approval, then blamed Plaintiff for not insisting that her supervisors understood the reasoning behind her opinion.   Ms. Melochick

then berated Plaintiff in asking whether Plaintiff has a copy of the office Contract Manual, which provides legal and policy guidance, as well as contract language, useful in drafting contracts.

23.     Had the facts of Paragraph No. 20 not occurred, the evaluation comments would be understandable. Since that was not the case, however, Plaintiff further responded to the August 2, 2016 evaluation that, "[g]iven the patent fabrication of just this statement alone, it calls into question the veracity of other comments in this evaluation as well as intent."

24.     Plaintiff concluded her response to the August 2, 2016 evaluation to address a note left on the copier of failure to keep Public Works Director Lynn Allsbrook (Plaintiff's primary client) in the loop with respect to adding him in the approval chain on City Council agenda items and a rate ordinance and solid waste matter.

25.     On August 5, 2017, almost immediately upon finding the note in Paragraph No. 24, at approximately 1 p.m. Plaintiff asked Mr. Allsbrook if he felt Plaintiff was keeping him out of the loop. Mr. Allsbrook responded there was no issue. Plaintiff further questioned whether Mr. Allsbrook would tell her if there was an issue, and he assured Plaintiff he would. Mr. Allsbrook never raised any complaints with Plaintiff regarding her work product but is listed as a witness against her in the City's Position Statement (further discussed in Paragraph Nos. 102 through 118), leading one to question whether Mr. Allsbrook engaged in a falsehood when assuring Plaintiff he would inform her of any concerns about Plaintiff's representation or whether he engaged in a falsehood when collaborating with the City in its Position Statement.

26.     The foregoing evaluations and surveys are included in Plaintiff's permanent file.

**Racial Bias Claim**

27.     On June 29, 2015, Plaintiff hand delivered a memo to the CA outlining seven instances of racial bias causing Plaintiff concern and invited the CA to discuss those concerns.

28.     Plaintiff's concerns included a pattern of refusing to promote the three African American attorneys in the CAO, disparaging evaluations for two of them and encouraging all three to seek higher-level opportunities outside of the CAO.

29.     The CA initially refused to grant an interview to one African American attorney who applied for a promotion from a Deputy to Senior Deputy Attorney, but subsequently supported his application for an Assistant City Manager ("ACM") position.

30.     The CA claimed the other African American attorney should have been subjected to more severe disciplinary action but promised to support her application for the City Attorney position in another jurisdiction.

31.     Months after Plaintiff's receipt of the Letter of Guidance ("LOG") discussed in Paragraph Nos. 36 through 46, the CA arranged a meeting among her, a Council member, and Plaintiff wherein Plaintiff was encouraged to oppose an incumbent elected official.

32.     The CA told Plaintiff the council member asked Plaintiff to consider running for the elected position; but at the meeting the council member revealed the CA indicated Plaintiff was interested in the position.

33.     Prior to these conversations, Plaintiff never considered running in any election. The CA's support of Plaintiff seeking an elected position conflict with the evaluations and LOG Plaintiff received from the CA.

34.     On July 2, 2015, Plaintiff requested a meeting with the full City Council to discuss her racial bias concerns.  City Council agreed.

35.     Late in the afternoon on July 7, 2015, Plaintiff found the CA's response to her June 29, 2015 memorandum of concerns on her desk, disputing all of Plaintiff's concerns.

**Letter of Guidance**

36.     On July 12, 2014 the CA called Plaintiff into a meeting with Plaintiff's former immediate supervisor, Senior Deputy City Attorney Lesa Yeatts ("Ms. Yeatts"), and handed Plaintiff a LOG alleging a number of performance deficiencies (*see* Exhibit B), which as illustrated herein, was a mere pretext for the CA's unlawful behavior.

37.     The LOG accused Plaintiff of exercising poor judgment in advancing an easement vacation that was not legally permissible and collaborating with an employee lacking sufficient legal expertise to make a sound decision.  To the contrary, Plaintiff advanced an opinion based on Public Works policy of public easement areas, which clearly is defensible.

38.     The LOG also accused Plaintiff of advancing an amendment without collaborating to discover the matter required Planning Commission approval.  As an example of disparate treatment, on March 16, 2016, Plaintiff was informed Ms. Melochick also attempted to amend the site plan ordinance without going through the Planning Commission.  However, given her legal and management errors highlighted herein, upon information and belief, Ms. Melochick did not receive a LOG.

39.     The LOG further accused Plaintiff of being responsible for the CA receiving an irate phone call from a customer claiming Plaintiff responded to his email that his inquiry would be answered when Plaintiff returned from vacation.  Contrary to the allegation, Plaintiff promptly

8

answered one question to the extent she could and replied to the customer that his other question required more research, which Plaintiff would conduct upon returning from vacation.

40.     The LOG additionally accused Plaintiff of faultily instructing land disturbing staff to have the permits, which Plaintiff routinely signs, to be signed by an attorney outside of the designated team.  The CA did not fully explain the team concept until after the LOG was issued; and Plaintiff shared her plan of action with Ms. Yeatts, who repeated to the CA that she had no objection to Plaintiff's plan of action.  The CA verbally told Plaintiff the problem was Plaintiff told Ms. Yeatts of the proposed plan rather than ask her if the plan is acceptable.

41.     The LOG faults Plaintiff for engaging in a discussion with a colleague about redesigning office space that should have been directed to the CA.  Plaintiff's colleague approached her to discuss reconfiguration of a portion of office space because of Plaintiff's architectural training.  This conversation was a mere innocuous discussion in that it was not intended to be an action item.  No decisions were made; not one idea was reduced to writing; nor any stick of furniture moved.

42.     The LOG advises that, since Plaintiff is paid from stormwater utility fees, she must devote 50% to 75% of her time to stormwater matters.  Thus, field visits must be curtailed, preparation of correspondence for the former Director of Public Works must be limited to enforcement matters; and per an alleged office policy, Plaintiff may not attend community meetings outside the office.

43.     Plaintiff has no control over the assignments received.  In fact, on November 3, 2015, the CA assigned Plaintiff to the Neighborhood Commission and in 2017, to the Hampton Clean City Commission, neither having any relation to stormwater.

44.    Additionally, of several colleagues questioned, including one of who had been employed in the office long before the CA arrived, none ever heard of the alleged policy against attending community meetings; nor has the CA ever produced a copy of the policy.  The issue of attorneys not attending community meetings created difficulties for the former Director of Public Works (regarding Franktown Road meeting at the end of February 2014) and for then councilmember, now Mayor Donnie Tuck (regarding the Otley Road presentation on November 19, 2014).  Nevertheless, Plaintiff complied.  However, later the CA revised her opinion at the last moment to try to prohibit Plaintiff from attending a community meeting *inside* the office.  This Franktown Road issue escalated to the point of City Manager involvement and the CA relenting to allow Plaintiff to attend the meeting in City Hall.

45.    The LOG concludes with the threat that, if changes do not occur, further options may include a formal performance improvement plan or discipline. Plaintiff has maintained her work ethic and continued her normal practice of working within the guidance provided. Undoubtedly, the CA was laying the groundwork for Plaintiff's termination, which is consistent with her prior acts taken with other employees.

46.    Upon information and belief, LOGs may be rescinded or may remain in an employee's permanent file.  The CA chose the latter with respect to Plaintiff.  Plaintiff was informed the CA shared the existence of the LOG with other attorneys in the office, who had no business reason to know about it, causing Plaintiff embarrassment and humiliation, leaving her demoralized.

**Inconsistent Promotion Policy**

47.    Paragraph No. 10 is incorporated by reference as if fully set forth herein.

48.     On or around May 2015, a White attorney with merely three years' experience received a permanent promotion to a Senior Assistant City Attorney.

49.     Within days of the younger, White attorney's promotion, on May 11, 2015, Plaintiff was given a temporary promotion because, according to the CA, Plaintiff met a fictitious five-year local government attorney experience threshold, that was unheard of heretofore and which the CA herself did not adhere to as illustrated in Paragraph Nos. 48 through 51.  This temporary promotion could be revoked at any time, and the CA informed Plaintiff she would have to apply for the permanent position in a year.  The CA gave a couple of reasons for delaying Plaintiff's permanent promotion.

50.     The CA relied on the spurious allegations of misconduct contained in the LOG as a basis for delaying Plaintiff's permanent promotion.

51.     The CA also informed Plaintiff her promotion was delayed because Plaintiff had not worked in the CAO for five years.  At the time, Plaintiff had a total of thirteen years' legal experience working for federal and local governments as well as private firms.  The CA failed to hold two White attorneys to the five-year threshold.  One was promoted after three years in the CAO and the other hired at a senior level without *any* legal experience in the CAO.

## Meetings with City Council

52.     On or about July 8, 2015, Plaintiff shared her concerns in Paragraph Nos. 8 through 11, 27 through 30, 32 through 33, and 36 through 49 with City Council.  The current mayor, who then was a councilmember, asked the rhetorical question of whether Plaintiff anticipated retaliation to occur after voicing her complaints.  At the conclusion of the meeting, Plaintiff requested that her personnel file be sanitized and that she receive a permanent promotion.

53.     Also on July 8, 2015, City Council interviewed the former Director of Public Works, the ACM who formerly worked in the CAO, and the Director of Human Resources ("HR") to glean their experiences with and assessments of the CA's performance.

**Outside Firm Investigations**

54.     On September 11, 2015, the Director of HR informed the CAO that a third party was retained to investigate allegations of discrimination and low morale in the CAO.

55.     Despite assurances from the Director of HR to CAO staff on September 15, 2015 that the City is committed to ensuring all "work in a professional environment free of discrimination, harassment and retaliation ... [and] individual comments will remain confidential," details from the investigation identifying which employees shared what information, in fact, were shared with the CA.

56.     On or around September 16-17, 2015, all employees of the CAO were given the opportunity to meet with the investigator, who represents localities, to discuss claims of discrimination and low morale.

57.     Plaintiff provided the investigator with a notebook of narratives, emails, and other documents supporting her claims.

58.     One of Plaintiff's White colleagues said he reported the CA's admission about being hesitant to hire another Black female "because the two in the office do not like her."

59.     On or about November 3, 2015, Plaintiff met with the mayor, vice mayor, and the third-party investigator wherein the investigator verbally shared that mismanagement was found but not discrimination because the CA treated everyone badly.

12

60.     Plaintiff requested the investigator's findings in writing.  Initially, she resisted, stating she did not see what difference it would make.  Eventually, she agreed.

61.     On November 4, 2015 the investigator informed Plaintiff that, while the CA's "conduct may be unfair, arbitrary and even unprofessional, it seems that this conduct is not limited to any particular protected class."  Hence, violation of the Standards of Conduct Policy was found but no violation of anti-discrimination laws.

62.     Plaintiff was informed City Council instructed the CA to attend management and equal employment seminars.

63.     Upon information and belief, in or around December 2015 City Council voted 4-3 in favor of the CA's termination.  Even though all City employments are at will, a supermajority vote was sought since Hampton does not want to be in the headlines like a neighboring jurisdiction. As a compromise, the CA was suspended for a week in December 2015.

64.     The investigator returned to City Hall on March 29-31, 2016 to conduct follow-up interviews. Plaintiff shared her beliefs of retaliatory conduct and the inconsistent treatment of the mid-year survey.  Plaintiff questioned the value of the survey if the CA arbitrarily substitutes her judgment for that of the survey results.  See Paragraph No. 15.

65.     Plaintiff learned not all employees participated in the second investigation on March 29-31, 2016 because results of the first investigation were shared with the CA.  See Paragraph No. 55.

66.     On or about July 15, 2016 the investigator returned to report her findings that no evidence of discrimination was found.  However, the Mayor requested that Plaintiff inform him of any further experiences of a discriminatory or retaliatory nature.

**Retaliatory Behavior**

67.    *See* Paragraph Nos. 68 through 118.  As requested, Plaintiff continued to keep City Council apprised of retaliatory acts she was enduring.

**Disparate Treatment and Harassment**

68.    Paragraph Nos. 8 through 67 are incorporated by reference as if set forth fully herein.

69.    Plaintiff's primary office is located in City Hall, and her primary client remains the Department of Public Works ("DPW"), which has offices at several locations.  Sometime around 2011, one of the DPW managers discussed with Plaintiff that some DPW staff in other buildings are hesitant to meet Plaintiff in City Hall to discuss their legal issues.  Therefore, in Plaintiff's effort to better serve her clients and management's desire to meet the needs of his staff, Plaintiff was given a satellite office in the Operations building on Back River Road where she worked on average one day per week.  The City Manager applauded this action.

70.    A few months after her return to the City, the CA's forebade Plaintiff from utilizing her satellite office because allegedly the Operations staff would try to get Plaintiff to do their work.  The CA's allegation was never a problem.  During the CA's tenue, other White attorneys are allowed to maintain satellite offices in their clients' office space – one in the Fire Division, one in Economic Development, and another in Consolidated Procurement.

71.    In or around June 2015, the CA hired Ms. Melochick as a Senior Deputy City Attorney, a younger White female, who at the time had only five years' legal experience, none in local government, and none in Plaintiff's practice area, to supervise the two African American attorneys having thirteen and sixteen years' experience and a White attorney with three years' experience.  The CA required Plaintiff to have five years' experience in the CAO for a promotion.

72.     In or around April, 2016 Plaintiff's permanent deputy position was posted, which required prior municipal legal experience whereas that for Plaintiff's supervisor did not.

73.     Plaintiff applied for and received the permanent promotion around May 2016. The CA informed Plaintiff she had been doing a great job for a year and applauded the quality of Plaintiff's legal advice, the counseling offered to her clients, and commended Plaintiff for working hard. No additional compensation was attached to the promotion.

74.     On or about June 17, 2016, Plaintiff's White paralegal neglected to submit a leave request. When he returned on June 19, 2017, Ms. Melochick stated his failure to submit a leave request "was no big deal."

75.     On June 29, 2016, Plaintiff received yet another email from Ms. Melochick alleging ineffective communication. Plaintiff is admonished for submitting an electronic leave request and not speaking with her personally or through emails.

76.     On July 6, 2016, Ms. Melochick accused Plaintiff of not showing up for work and not requesting time off, which is not true. Prior to leaving the office on July 1, 2016, Plaintiff put the "out of office" response on her emails and left a voice mail greeting to this effect. Plaintiff shared Ms. Melochick's accusatory email with HR.

77.     After Plaintiff's paralegal confirmed he witnessed Plaintiff enter the leave request in the electronic system, the matter was not raised again until Plaintiff received a copy of the City's Position State discussed in Paragraph Nos. 102 through 118. The Information Technology Department staff reported Plaintiff's experience was not the first of its kind involving the electronic timekeeping program not retaining information submitted.

78.     The CA seldom interacts with Plaintiff directly, but her *modus operandi* continues through Ms. Melochick, for example (a) despite having hundreds of hours of annual leave, Plaintiff is questioned whether she has leave to take after submitting a form for annual leave; (b) Ms. Melochick strongly defended a message from the CA about being mindful of when attorneys arrive in the building because of a second-hand comment made by a security guard.  The CA ultimately apologized for the message that was delivered as she intended; and (c) after submitting a form to take a bonus day off for the quarter, Plaintiff was asked whether she had signed up for the outside investigator interview.  There was back and forth about when staff could schedule their interviews. Ms. Melochick ultimately relented after re-reading the email that sign-ups were to occur the following day.

79.     On July 14, 2016, the CA emailed Plaintiff about a "tone" Plaintiff allegedly had during a conversation with a City Council staff member regarding deferral of Parking Authority appointments.  Apparently, the City Clerk referred her staff to the CA with this complaint.  As an attorney with fourteen years' legal experience, the CA instructed Plaintiff to speak with her or Ms. Melochick to avoid misunderstandings.  Plaintiff called the Council staff member from her paralegal's phone, and he reported not hearing any "tone" in Plaintiff's conversation with this employee.

80.     On July 28, 2016, Ms. Melochick, making yet another assumption, accused Plaintiff of approving Plaintiff's paralegal leave request on July 27, 2016, which she reminded Plaintiff in another snarky email she has no authority to do so.  Plaintiff informed Ms. Melochick that her paralegal left a voicemail message before 7 a.m.  Plaintiff did not speak with him.

81.     Ms. Melochick next requested that Plaintiff forward her the voicemail, but Plaintiff routinely deletes voicemail messages after listening to them.

16

82.     Ms. Melochick then asked Plaintiff to request Information Technology to retrieve the deleted message, but it could not.

83.     Also on July 28, 2016, Plaintiff asked the Director of HR when management training for CAO staff will begin because snarky emails and faulty assumptions continue.

84.     Via email at 9:26 a.m. on August 1, 2016, Plaintiff informed Ms. Melochick that she would be leaving the office at 2:40 p.m. for an Employee Assistance Program appointment for counseling in dealing with her ordeal in the CAO. Plaintiff was chastised for not speaking with Ms. Melochick before leaving the office.

85.     Sometime in or around late August 2016, Plaintiff's paralegal was out of the office for almost two weeks. He left a message one day informing Ms. Melochick he would not be in the office. Another day he did not call in until Plaintiff sent him a text reminder around 11 a.m. Again, no reprisals.

86.     Plaintiff often was criticized for not communicating about the status of her cases. Yet, on October 12, 2016, the CA advanced a resolution to City Council dissolving the Hampton Parking Authority, one of Plaintiff's clients, without sharing this information with Plaintiff.

87.     When Plaintiff questioned the CA about whether members of the Authority had been told, the CA advised Plaintiff to tell any members who contacted her directly to respond she knows nothing about it, which is not the truth after Plaintiff saw the resolution on the Council agenda.

88.     The CA commended one of the younger White attorneys with approximately four years' experience for completing an extra assignment, gave her a bonus, and assigned this same attorney to manage the legal interns. This opportunity was not shared with the entire office, and

neither of the more experienced African American attorneys was offered this management prospect or additional compensation.

89.     Before leaving the office on February 2, 2017, Plaintiff requested the real estate paralegal to assemble a list of out-of-state process servers in that Plaintiff post-dated pleadings and forwarding letters in two condemnation cases.

90.     Late in the evening on February 2, 2017, Plaintiff received an email from Ms. Melochick wherein she alleges Plaintiff requested the real estate paralegal to have documents sent to an out-of-state process server that day.  Plaintiff was instructed she should have provided more specific guidance, and this paralegal should not be responsible for this type of research even though Plaintiff's paralegal was out of the office this day.  The two Senior Deputies reviewed Plaintiff's files.

91.     Plaintiff clarified on February 3, 2017 that she did not ask for any documents to be served.  She asked for a list of out-of-state servers.  The documents were drafts as evidenced by their post-dates.

92.     When Plaintiff met with the Senior Deputy City of Litigation on February 3, 2017, this attorney claimed she had not noticed the post-dates, which contradicts the paralegal's statements that the Senior Deputy asked why the documents were post-dated.

93.     On Friday morning, January 13, 2017, the CA called Plaintiff into a meeting with her and Ms. Melochick to relay Mr. Allsbrook's "extreme dissatisfaction" that on Wednesday, January 11, 2017 Plaintiff allegedly questioned Mr. Allsbrook's assistant about another employee's employment status.

94.     Even though Plaintiff responded that the conversation never took place, the CA proceeded to tell Plaintiff which attorney handles personnel matters; and Plaintiff is not to answer any questions of this nature. All the while, Ms. Melochick took notes.

95.     Later that day, Plaintiff learned another African American employee and Mr. Allsbrook's assistant had the conversation, which Plaintiff relayed to the CA.

96.     None of the supervisors ever asked Plaintiff whether the conversation in Paragraph Nos. 93 through 95 occurred, and neither acknowledged responsibility upon discovering it did not.

97.     On January 17, 2017, Plaintiff emailed the City Manager about the actions of employees under her supervision that further contribute to Plaintiff's hostile work environment.

98.     Plaintiff informed the City Manager the other acrimonious responses from Mr. Allsbrook, with Plaintiff concluding that, "I trust you recognize I am not so thin skinned as to be offended by shortcomings that inevitably occur from time to time. However, I believe the frequency, escalating nature, and lack of veracity, accountability, and general professionalism merit addressing."

99.     The City Manager instructed the Director of HR to address Plaintiff's January 17, 2017 email. Plaintiff, Mr. Allsbrook, the City Engineer, and the Director of HR met, wherein Mr. Allsbrook shared a copy of the email from his assistant claiming Plaintiff asked her questions about the other employee's absence from the office. Mr. Allsbrook said he is willing to put this incident behind us, and he learned a valuable lesson. Plaintiff again asked Mr. Allsbrook to contact her directly if he has any question about anything Plaintiff did or did not do. He said he would, but he did not.

100.    On May 6, 2017, Mr. Allsbrook sent an email to a number of staff accusing Plaintiff of submitting three items for the Council agenda to him late. He soon realized not only were the

items not sent late, but they actually were sent to him at least one week early. No apology was issued.

101.    Plaintiff continued to share the foregoing incidents through the Director of HR to City Council as requested, all to no avail. The discriminatory, unprofessional behavior continues.

**The City's Position Statement**

102.    On November 4, 2016, Plaintiff received the City's Position Statement, which contains six blatantly false information, such as Plaintiff has not suffered any adverse employment action. *See*, however, Paragraph Nos. 8 through 118.

103.    The City claimed Plaintiff treated her "no show, no call" as a trivial matter, then proceeded to explain the importance of employers knowing when employees are expected. See, however, Paragraph Nos. 76 through 77.

104.    The City further claims attorneys in the office were not comfortable with the CA's "'no-nonsense' management style." If complaints truly amounted to no more than a change in management style "that contrasted with the somewhat softer style of the prior City Attorney," that begs the question of why some of the complaining attorneys never worked under the prior City Attorney and are the CA's own hires. *Also see* Paragraph Nos. 59 and 61 through 63.

105.    The City's reference to the majority African American City Council and its heavy reliance on the opinions of the African American Director of Finance is unpersuasive that discrimination is not occurring. Per *U.S. v. Crosby*, 59 F.3d 1133, 1135, n.4 (11th Cir. 1995), Title VII violations may occur even where the supervisor or decisionmaker are of the same race as the alleged victim.

106. Upon information and belief, the mayor acknowledges deficiencies in the CA's performance, thus, the statement he is working with her because he believes she can be saved.

107. The City next claims the LOG was issued based on my failure to collaborate with others in the office. See Paragraph Nos. 36 through 46.

108. Paragraph Nos. 9 through 26 contradict the City's clam that the CA continued to give Plaintiff positive performance evaluations. In fact, quite the opposite is true.

109. The City justifies the younger White attorney's promotion ahead of Plaintiff, in part, because the younger attorney had accepted additional assignments, which opportunities were not shared with Plaintiff. See Paragraph No. 88.

110. The City further claims its hiring practices are made without regard to race; however, see Paragraph No. 58. Contrary to the City's claim that the CA had nothing to do with who was deemed qualified, two African American females (one from the Hampton Commonwealth Attorney's Office, and the other from Chesapeake), both making it through the HR process, and both with more experience than the White male the CA hired who had virtually no experience.

111. The City relies on the opinion of Mr. Allsbrook against Plaintiff who has exhibited less than credible character. *See* Paragraph Nos. 24 through 25, 93, and 95 through 100.

112. The City claims Plaintiff was cavalier about being a no show-no call, which is blatantly false. See Paragraph Nos. 76 through 77. Plaintiff resents the City's mischaracterization of her professional conduct to insinuate that, at this stage of her career, she is unaware of and totally disregards the importance of physical accountability in the office. Plaintiff challenges the

City to identify where and when Plaintiff "characterize such notice as 'trivial.'" In Plaintiff's over 40 years working history, she has never been a no show-no call.

113.    Incredibly, the City contends Plaintiff's lack of collaboration has led to concerns from a number of directors about Plaintiff's work product, which allegedly resulted from one director's review of the NFWF/CBF Contract that is included in one of Plaintiff's performance evaluations. See Paragraph Nos. 16 through 23.

114.    Plaintiff further stated the foregoing paragraph illustrates just one of many fabrications the CA speaks seemingly without remorse. Plaintiff's rebuttal included evidence of the CA not being truthful on camera to a councilmember (now mayor).

115.    Plaintiff's rebuttal acknowledges making mistakes and illustrated a sampling of those made by the CA, Ms. Melochick, the other Senior Deputy City Attorney, and the younger, White attorney referenced earlier.

116.    If Plaintiff's mistakes are due to lack of collaboration, Plaintiff questioned what explains the foregoing errors? The examples were presented not to further embarrass anyone but to highlight, again, all of us make mistakes. However, not all mistakes are treated equally in the CAO.

117.    Plaintiff concluded her rebuttal with the statement that the CA is known to boast that City Council will not do anything with her, which appears to be true.

118.    The knowingly false statements to a tribunal in Paragraph Nos. 102 through 104, 108, 110, and 112 constitutes fraud and defamation and violates the Virginia Rules of Professional Conduct.

## STATEMENT OF CLAIM

### Claim 1 – Racial Discrimination

119.    As demonstrated in Paragraph Nos. 8 through 118, Defendant has subjected Plaintiff to unlawful discrimination because of her race in violation of Title VII of the Civil Rights Act of 1964, as amended, as an act of race-based discrimination in employment practices.

120.    As a direct and proximate result of this unlawful racial discrimination, Plaintiff has suffered and continues to suffer injuries in the form of personal and professional distress, humiliation, and embarrassment, loss of pay, loss of career advancement opportunities, loss of enjoyment of life, including other emotional distress, pain, and suffering.

### Claim 2 - Retaliation

121.    Pursuant to Paragraph Nos. 11 through 118, Defendant subjected Plaintiff to unlawful retaliation because of her protected equal employment opportunity activity in violation of Title VII of the Civil Rights Act of 1964, as amended, as an act of unlawful retaliation in employment practices.

122.    As a direct and proximate result of this unlawful retaliation, Plaintiff has suffered and continues to suffer in the form of personal and professional distress, humiliation, and embarrassment, loss of pay, loss of career advancement opportunities, loss of enjoyment of life, including other emotional distress, pain, and suffering.

### Claim 3 – Disparate Treatment

123.    Pursuant to Paragraph Nos. 8 through 118, Defendant subjected Plaintiff to unlawful retaliation because of her protected equal employment opportunity activity in violation of Title VII of the Civil Rights Act of 1964, as amended, as an act of unlawful retaliation in employment practices.

124.   As a direct and proximate result of this unlawful retaliation, Plaintiff has suffered and continues to suffer in the form of personal and professional distress, humiliation, and embarrassment, loss of pay, loss of career advancement opportunities, loss of enjoyment of life, including other emotional distress, pain, and suffering.

**Claim 4 – Hostile Work Environment**

125.   Pursuant to Paragraph Nos. 8 through 118, Defendant subjected Plaintiff to unlawful retaliation because of her protected equal employment opportunity activity in violation of Title VII of the Civil Rights Act of 1964, as amended, as an act of unlawful retaliation in employment practices.

126.   As a direct and proximate result of this unlawful retaliation, Plaintiff has suffered and continues to suffer in the form of personal and professional distress, humiliation, and embarrassment, loss of pay, loss of career advancement opportunities, loss of enjoyment of life, including other emotional distress, pain, and suffering.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that this Court enter judgment in her favor and against Defendant on the claims of employment discrimination and retaliation raised herein pursuant to Title VII of the Civil Rights Act of 1964, as amended, and provide her with the following relief:

(a) Award Plaintiff compensatory damages against Defendant in the amount of $300,000.00 plus interest;

(b) Order Defendant to remove all negative documentation from Plaintiff's personnel file, including but not limited to the wrongful Letter of Guidance and negative, unsubstantiated surveys included in Plaintiff's evaluations during the relevant times included in this complaint;

24

(c) Enjoin Defendant from discriminating or retaliating against Plaintiff in the future;

(d) Award Plaintiff the costs of bringing and maintaining this civil action and administrative charges that preceded it, including reasonable attorneys' fees pursuant to 42 U.S.C. § 2000e-5(k);

(e) Award Plaintiff punitive damages in the amount of $300,000.00;  and

(f) Award Plaintiff such other and further relief as the interests of justice require.

### JURY DEMAND

Plaintiff hereby requests a trial by jury on all issues of act and measure of damages.

Respectfully submitted,

Veronica E. Meade (VSB No. 66727)
1287 Big Bethel Place
Hampton, VA  23666
Tele:  (757) 268-6309
Vmeade97@gmail.com

*Pro Se*